IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BILLIE NOLES,**                           Case Number 3:15 CV 587

     Petitioner,                      Judge Solomon Oliver, Jr.

      v.                            REPORT AND RECOMMENDATION

**CHARLOTTE JENKINS,**

     Respondent.                      Magistrate Judge James R. Knepp II

## INTRODUCTION

Petitioner Billie Noles, a prisoner in state custody, filed a petition *pro se* seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Charlotte Jenkins filed a Motion to Dismiss (Doc. 11), which Petitioner opposed (Doc. 14). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Doc. 8). For the reasons discussed below, the undersigned recommends Respondent's Motion to Dismiss be granted.

## FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings were erroneous. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. Ohio's Sixth District Court of Appeals set forth the following findings of fact:

> {¶2} When G.B. was in the third grade she watched a sexual abuse video at school. After the video, G.B. approached her school counselor and reported that she had been sexually abused when she was a small child. The school counselor

notified the proper authorities. The Toledo Police Department assigned the case to Detective Shelli Kilburn. Detective Kilburn interviewed G.B., G.B's mother, and G.B.'s grandmother. She also interviewed appellant, Billie Noles.

*****

{¶9} A hearing was held on [a] motion to suppress. Detective Kilburn testified on behalf of the state. According to Kilburn, at the time appellant was identified as a suspect, he was staying at the Knights Inn in Rossford, Ohio. Detective Kilburn called appellant and invited him to the station for an interview. Noles informed the detective he had no means of transportation. Detective Kilburn offered to have a patrol car and its uniformed crew transport him to and from the station for the interview. Appellant accepted the detective's offer.

{¶10} A video recording of the 48 minute interview was admitted into evidence. The video indicates that upon arrival in the interview room, Detective Kilburn informed appellant he was there on his "own free will." She further stated, "[i]f you don't want to talk to me, you don't have to. It's in your best interest for you to talk to me here today, but at any time that if you want to get up and leave you have that right to do so. * * * If you don't want to be here you don't have to be here." Appellant indicated he understood and that he had nothing to hide.

{¶11} The detective informed appellant that he was a suspect in an investigation because the then nine-year-old victim had accused appellant of having sexual contact with her when she was four or five years old. Initially, appellant denied any sexual contact with the girl. Nineteen minutes into the interview, Detective Kilburn suggested that G.B. might have "come on" to appellant; that G.B. might have initiated the sexual contact. The detective indicated that she was not suggesting that appellant forced G.B. to do anything. Rather, Detective Kilburn reminded appellant that G.B. claimed it happened and that he needed to "think about how this happened, because we know it wasn't forced." Twenty-three minutes into the interview, appellant admitted being alone in the bathroom with G.B. He also admitted that he remembered his pants being down. The detective again suggested G.B. initiated the contact. Twenty-four minutes into the interview appellant stated, "I was on no medications at the time * * * my mind races, so I don't know if I did it to her or she did it to me. I believe now that it has come to my attention that it happened, I was on no medications at the time * * * I never really forced her that I know of on me like that." When asked if he remembered G.B. putting her mouth on his penis, appellant replied "I believe so." He claimed it happened once, that it lasted less than a minute, and that he did not ejaculate.

{¶12} Twenty-six minutes into the interview, appellant asked if he needed to get a lawyer. He indicated that he dropped out of school in the eleventh grade and that his reading level was at the third or fourth grade level. Without answering appellant's question, Detective Kilburn noted there is a difference between a forced sexual act and a sexual act that is not forced.

2

{¶13} Twenty-nine minutes into the interview appellant claimed that G.B. approached him and put her mouth on his penis "maybe once." He denied the allegation that it happened every time she was at his house. Appellant also denied the allegation that he gave G.B. ice cream after the alleged sexual acts occurred. Appellant insisted he would not give a child ice cream as a "reward for something like that."

{¶14} Thirty-five minutes into the interview appellant was asked if there was anything else about that day that would help the detective with her investigation, appellant replied "I noticed that she would hump her baby dolls a lot." Near the end of the interview, Detective Kilburn allowed appellant to ask her questions. Appellant asked several questions such as, "What happens next?" And, "If they interview me again, will they come and get me?" Appellant asked, "What happens if it comes back that it was my fault?" Appellant also asked whether he would have to register as a sex offender or serve a jail sentence.

{¶15} After the interview, appellant was driven back to the Knights Inn in the patrol care by the uniformed officers.

*****

{¶17} On September 24, 2012, the trial court orally denied appellant's motion to suppress and a jury trial commenced. At trial, G.B. testified that when she was four years old and still living with her mother, she and her brothers would be dropped off at Bill[ie] and Sue's house almost every week. At first, she and her brothers would play games and watch movies. At some point, however, Bill[ie] began taking her into the bathroom while her brothers played in the front room. Once in the bathroom, Bill[ie] would pull his pants to his knees and put her mouth on his penis. Afterward, Bill[ie] would "pull his pants back on and give [her] some ice cream." Bill[ie] instructed G.B. not to tell anyone.

{¶18} G.B. testified the sexual contact occurred "more than ten times" and that it happened "almost every time" she went to Bill[ie]'s house. She never told anyone about the touching until she was in third grade. When asked why she finally told the counselor at her school, G.B. explained, "because we were talking about people touching other people and stuff like that."

{¶19} G.B.'s mother testified that she lost custody of her children in August 2006, because she was in an abusive relationship. The two oldest boys live with their father. The five youngest children now live with G.B's grandmother. In February and March of 2006, the mother would take all or some of the kids to Billie and Sue's house so that Sue could "babysit" the children. When asked how often this babysitting occurred, the mother testified, "I can recall four or five times give or take maybe a few other times. I believe no more than ten times."

{¶20} When asked why she stopped taking her children to Billie and Sue's house, the mother explained,

> I stopped taking my daughter over there because when I would go
> to drop the kids off she would cry. The other kids were fine
> because they played video games and things like that, but she
> would just cry. And I didn't understand why. I asked her if
> something was wrong, and I just didn't— that's my baby girl. I
> didn't like to see her cry, so I quit taking her, and she would go
> with me.

{¶21} G.B.'s grandmother testified that she obtained legal custody of the younger
children in 2007. In 2011, the grandmother received a telephone call from Lucas
County Children Services ("CSB"). The caseworker wanted to speak with her
about G.B. The grandmother explained:

> A. [G.B.] told the counselor about an episode that she had. So
> [CSB] wanted to talk to us about it and see if we knew.
> Q. Were you familiar with whom this episode involved?
> A. No, this was the first—brought to our attention. We were
> shocked.

{¶22} The grandmother testified that when she finally spoke with G.B. about the
alleged sexual contact, "[G.B.] was scared. She was crying. She was ashamed.
And we told her it wasn't her fault." The grandmother further testified:

> Q. What did [G.B] tell you happened?
> A. She said that every time she would go over to Billie and Sue's
> house that Billie would take her into the bathroom, and he would
> make her put his penis in her mouth.
> Q. And did she tell you that this happened more than one time?
> A. She said about every time she went over there.
> * * *
> Q. And you mentioned that [G.B.] was crying that she thought this
> was her fault. What did she say to you?
> A. She was afraid to tell us because she thought we were going to
> be mad and angry with her and not love her.

{¶23} Dr. Cassel testified that upon her examination of appellant she found him
competent to stand trial. She also found that he suffered from periodic anxiety
attacks and mild to moderate mental retardation. Dr. Cassel testified that when she
interviewed appellant he admitted the kind of behavior he was accused of
committing was wrong, but that he denied committing the offenses.

(Doc. 11, Ex. 14).

4

**PROCEDURAL HISTORY**

*Trial Court Proceedings*

The September 2011 term of the Lucas County Grand Jury issued an indictment charging Petitioner with four counts of rape. (Doc. 11, Ex. 1). Petitioner pled not guilty by reason of insanity. (Doc. 11, Ex. 2). Petitioner later also entered a plea of not guilty. (Doc. 11, Ex. 3).

On November 22, 2011, a clinical psychologist from Court Diagnostic & Treatment Center, Charlene A. Cassel, Ph.D., authored a report concluding that Petitioner tested in the moderate mental retardation range but was competent to stand trial. (Doc. 11, Ex. 14). Petitioner asked the court to order a second opinion as to his competency to stand trial, and the court did so. (Doc. 11, Ex. 4). The second competency evaluation found Petitioner to be competent to stand trial. (Doc. 11, Ex. 5).

Petitioner then filed a motion to suppress his statements made to the police; he argued that he never knowingly, intelligently, or voluntarily waived his *Miranda* rights. (Doc. 11, Ex. 6). After a hearing, the court denied Petitioner's motion to suppress his statements. (Doc. 11, Ex. 7). The case proceeded to trial and the jury found Petitioner guilty on all counts and also found that the victim was less than 10 years old at the time of the offense. (Doc. 11, Ex.s 8-9). On October 12, 2012, the court sentenced Petitioner to four consecutive life sentences and fined him $20,000.00 for each count. (Doc. 11, Ex. 10). Petitioner was also adjudicated a Tier III Child Victim Offender and advised of his registration duties. (Doc. 11, Ex. 10).

*Direct Appeal*

On October 30, 2012, Petitioner, through counsel, filed a Notice of Appeal with the Sixth District Court of Appeals, Lucas County. (Doc. 11, Ex. 11). In his brief filed January 22, 2013, Petitioner raised the following assignments of error:

1. The trial court erred by denying Defendant's Motion to Suppress statement of the Defendant as they were not knowingly, voluntarily and intelligently made.

2. Trial counsel was ineffective and prejudiced Defendant/Appellant's right to a fair trial as guaranteed by the U.S. and Ohio Constitutions.

3. The trial court erred by allowing the alleged victim's mother to testify as to hearsay that is not covered under the Excited Utterance exception to hearsay.

4. The conviction was not sufficiently supported by credible evidence and was against the manifest weight of the evidence.

(Doc. 11, Ex. 12). The State filed a brief in response. (Doc. 11, Ex. 13). On September 20, 2013, the Ohio Court of Appeals affirmed the trial court's judgment. (Doc. 11, Ex. 14).

Petitioner did not appeal to the Ohio Supreme Court.

### *Application to Reopen Appeal-App. R. 26(B)*

On December 23, 2013, Petitioner, *pro se,* filed an application for reopening his appeal pursuant to Ohio App. R. 26(B). (Doc. 11, Ex. 15). Petitioner alleged that appellate counsel had provided ineffective assistance for not raising the following assignment of error on appeal:

1. The Defendant-Appellant's sentence must be considered void pursuant to *State v. Williams*, 129 Ohio St.3d 344 (2011).

Petitioner also argued that: 1) counsel did not argue that Petitioner should not have been convicted or sentenced under Senate Bill 10 (the "Adam Walsh Act") because the Act became effective after the dates of the offenses and 2) counsel failed to assign errors regarding consecutive sentences, first time offenders, or the excessive nature of the sentences. *Id.*

On February 6, 2014, the Ohio Court of Appeals denied as untimely Petitioner's application to reopen his appeal. (Doc. 11, Ex. 16). The court noted that App. R. 26(B) requires that an application for reopening must be filed "within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." *Id.* The decision on direct appeal was journalized on September 20, 2013, so the filing deadline under the

rules was Thursday, December 19, 2013. Petitioner filed his application for reopening four days late—on Monday, Dec. 23, 2013. *Id.* at 3. The court found that Petitioner did not demonstrate good cause for the delayed application. *Id.*

On March 20, 2014, Petitioner, *pro se,* filed a notice of appeal with the Ohio Supreme Court. (Doc. 11, Ex. 17). In his memorandum in support of jurisdiction, Petitioner set forth the following propositions of law:

> I.    The Ohio Court of Appeals erred and abused its discretion by denying Appellant's right to re-open his direct Appeal pursuant to App. Rule 26(B); due to Appellant counsel's ineffective assistance to assign error to [Appellant's] conviction and sentence, which must be considered void under *State v. Williams*, 129 Ohio St. 3d 344 (2011).

> II.   The Ohio State Court erred and abused their discretion by not determining Appellant`s conviction and sentence void pursuant to *State v. Williams*; as offenses were alleged committed in 2006 but he was convicted and sentenced to the Adam Walsh Act (AWA); which, in Ohio, did not become effective until January 1, 2008, rendering the retroactive application unconstitutional.

> III.  The Ohio State Courts erred and abused their discretion by imposing consecutive sentences without the required findings pursuant to O.R.C. 2929.12(E)(4) or consistent with constitutional principle of *Oregon v. Ice*, 129 S.Ct. 711 (2009), rendering a first time offender's sentence excessive and inconsistent with Ohio's felony sentencing statutes.

(Doc. 11, Ex. 18). The State waived response. (Doc. 11, Ex. 19). On May 14, 2014, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4). (Doc. 11, Ex. 20).

## FEDERAL HABEAS CORPUS

Petitioner filed the instant Petition for habeas corpus on March 25, 2015, asserting the following grounds for relief:

> **GROUND ONE:** The Ohio State Courts erred and abused their discretion by denying Petitioner's right to re-open his direct appeal and affirming this denial:

despite Petitioner's appellate counsel's ineffective assistance to assign error to Mr. Noles' conviction and sentence; which must be considered void as a violation of Ex Post Facto laws under both State and Federal law.

**GROUND TWO**: The Ohio State Courts erred and abused their discretion by not determining Petitioner's conviction and sentence void under state laws; namely the unconstitutional application of the Adam Walsh Act, which did not go into effect in Ohio until January 1, 2008 and the alleged offenses of Petitioner were committed in 2006. This retroactive application was an unreasonable determination in light of the evidence presented in the state court proceedings entitling Petitioner to Habeas Review.

**GROUND THREE**: The Ohio State Court erred and abused their discretion by imposing consecutive sentences without the required findings pursuant to the Ohio statute or consistent with constitutional principles articulated in *Oregon v. Ice,* 129 S. Ct. 711 (2009); rendering Petitioner's first time sentence excessive and inconsistent with Ohio's felony sentencing statutes.

(Doc. 1).

## MOTION TO DISMISS

Respondent moved to have the Petition dismissed as untimely. (Doc. 11).

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), there is generally a one-year period in which a prisoner in state custody may file a petition for habeas relief in federal court:

A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Under Rule 6(a)(1)(A), the statutory clock starts the day after the triggering event. Fed.R.Civ.P. 6(a)(1)(A). Applied to the case at bar, the triggering event is "the expiration of the time for seeking [direct] review". § 2244(d)(1)(A); *Bronaugh v. Ohio*, 235 F.3d 280, 284-285 (6th Cir. 2000).

Here, Petitioner had 45 days from the date the Ohio Sixth District Court of Appeals affirmed the judgment of the trial court to perfect an appeal to the Ohio Supreme Court. S.Ct.Prac.R. 7.01(A)(1)(a)(i).  The Sixth District affirmed his conviction on September 20, 2013; thus, the 45 days began to run on September 21, 2013, and concluded on November 4, 2013. Petitioner failed to perfect his direct appeal to the Ohio Supreme Court within that period. Thus, the one year statute of limitations for AEDPA purposes began running on November 5, 2013. Absent tolling, the one year period expired on November 5, 2014.

***Statutory Tolling***

Under 28 U.S.C. §2244(d)(2), a properly filed application for state post-conviction or other collateral relief with respect to the judgment tolls the running of the limitations period until the day the state supreme court decides the case or denies review. *Lawrence v. Florida*, 549 U.S. 327 (2007); *Isham v. Randle*, 226 F.3d 691 (6th Cir. 2000). To fall under the tolling provision, Petitioner's motion must be a qualifying state collateral action and be properly filed. *Artuz v. Bennett,* 531 U.S. 4, 8-9 (2000). However, this statutory tolling provision does not revive the limitations period, it can only serve to pause a clock that has not yet expired. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004); *Searcy v. Carter*, 246 F.3d 515 (6th Cir. 2001). Once the limitations period is expired, state collateral review proceedings can no longer serve to avoid the

statute of limitations bar. *Vroman v. Brigano*, 346 F.3d 598 (6th 2003); *Jurado v. Burt*, 337 F.3d 638, 641 (6th Cir. 2003).

Petitioner filed a motion to reopen his appeal pursuant to App.R. 26(B) on December 23, 2013. (Doc. 11, Ex. 15). A motion to reopen an appeal, is "not part of the direct appeal" for purposes of § 2244(d)(1) and thus, satisfies the first criteria for tolling purposes. *See DiCenzi v. Rose*, 452 F.3d 465, 468 (6th Cir. 2006). The second criterion requires that Petitioner's motion be properly filed, or more to the point, that it was timely filed. *See Pace v. DiGuglielmo*, 544 U.S. 408, 414, 417 (2005).

The Sixth District denied Petitioner's motion to reopen as untimely because it was filed four days beyond the 90-day statute of limitations period and he had not shown any good cause for the late filing. (Doc. 11, Ex. 16). The Ohio Supreme Court declined to accept jurisdiction over Petitioner's appeal of the denial of his motion to reopen his appeal. (Doc. 11, Ex. 20). As Petitioner's untimely motion did not meet the second criterion of being "properly filed", statutory tolling is not appropriate; and thus, his AEDPA limitations period ran uninterrupted from November 5, 2013, to November 5, 2014. *See, e.g., Dean v. Jeffries*, 2007 WL 3407405 (N.D. Ohio); *Hardy v. Moore*, 2007 WL 3232437 (S.D. Ohio); *Brownlow v. Konteh*, 2007 WL 3101715 (N.D. Ohio).

Thus, absent equitable tolling, the Petition is time barred.

### *Equitable Tolling*

Equitable tolling allows courts to review time-barred habeas petitions "provided that 'a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Robinson v. Easterling*, 424 F. App'x 439, 442 (6th Cir. 2011) (quoting *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010)). To demonstrate he is entitled to equitable tolling, a habeas petitioner must establish: 1) he has diligently pursued his rights;

10

and 2) "that some extraordinary circumstance stood in his way and prevented timely filing." *Jurado v. Burt,* 337 F.3d 638, 642 (6th Cir. 2003). Such equitable tolling, however, is rare, granted sparingly, and evaluated on a case-by-case basis, with the petitioner retaining the "ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011); *King v. Bell*, 378 F.3d 550, 553 (6th Cir. 2004).

In support of his request for equitable tolling, Petitioner raises his *pro se* status, his low IQ, and ineffective assistance of appellate counsel, as reasons his untimeliness should be excused. (Doc. 14, at 5-8). First, a Petitioner's *pro se* status, and his resultant ignorance of the law or procedural requirements, is not an extraordinary circumstance sufficient to justify equitable tolling. *Allen v. Yurkins*, 366 F.3d 396, 403 (6th Cir. 2004). Second, to seemingly have a legally credible argument in regard to mental incapacity, the Petitioner must make a factual showing of that incapacity and demonstrate a causal connection between the incapacity and a failure to timely file. *See Allen v. Bell*, 250 F. App'x 713, 716 (6th Cir. 2007) (citing *Lawrence*, 549 U.S. 327) (unpublished); *see also Bilbrey v. Douglas*, 124 F.App'x 971, 972-74 (6th Cir. 2005) (unpublished).  The facts in the record demonstrate that Petitioner was found competent to stand trial by two psychologists and he has provided no other evidence of his mental incapacity with this Petition. Further, Petitioner has not proven how his low IQ is causally connected to his inability to timely file; and thus, it is insufficient to warrant equitable tolling.

Third, Petitioner alleges broadly that the ineffective assistance of his appellate counsel in identifying potential errors prejudiced this filing, presumably because he had to research and file the motion independent of his counsel. (Doc. 14, at 6). On its face, this appears to be nothing more than second way of arguing Petitioner's *pro se* status entitles him to equitable tolling. However, even assuming Petitioner is implying a more substantive claim of ineffective assistance of appellate counsel; in the context of Rule 26(B) motions, claims of ineffective

11

assistance of counsel as the cause for failure to comply with procedural requirements are not generally justified. *See, e.g., Scuba v. Brigano*, 527 F.3d 479, 489 (6th Cir. 2007); *Rideau v. Russell*, 342 F.App'x 998, 1003 (6th Cir. 2009) (failure of appellate counsel to know of Rule 26(B)'s 90-day filing limitations period cannot be "cause" because appellant has no right to counsel at this stage) (unpublished); *Tolliver v. Sheets,* 594 F.3d 900, 929 (6th Cir. 2010) (appellate counsel did not have to warn appellant of Rule 26(B) filing deadline or even inform him of the possibility of filing a 26(B) motion); *but see Gunner v. Welch,* 749 F.3d 511, 519 (6th Cir. 2014) (finding where the post-conviction relief offers the first instance for defendant to challenge effectiveness of trial counsel, appellate counsel should advise defendant of the availability of and the necessity of proceeding timely). Considering these rulings as guidance in the arena of equitable tolling, it seems logical that whatever appellate counsel's alleged errors may have been they do not rise to the level of an "extraordinary circumstance" that "prevented timely filing." *Jurado,* 337 F.3d at 642.

Thus, Petitioner has failed to carry his burden that his claim warrants equitable tolling. Furthermore, Petitioner has failed to assert actual innocence as an entitlement to equitable tolling. *Schlup v. Delo*, 513 U.S. 298 (1995). Thus, his Petition should be dismissed as time-barred.

### CONCLUSION AND RECOMMENDATION

Following review, the undersigned recommends the Court grant Respondent's Motion to Dismiss the Petition as time-barred.


      s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985), *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).